UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No.  16-mj-81 (HB) |
| | ) | |
| v.                    Plaintiff, | ) | |
| | ) | **DEFENDANT'S SENTENCING** |
| MICHAEL JOHN HARRIS, | ) | **POSITION** |
| | ) | |
| Defendant. | ) | |

     Michael Harris, through undersigned counsel, respectfully submits the following position regarding sentencing.  On March 2, 2016, he appeared before the Court and entered a guilty plea to two counts of violating the Freedom of Access to Clinic Entrances Act, 18 U.S.C. Sections 248(a)(1).  This plea was entered pursuant to an agreement between Mr. Harris and the government, a copy of which has been filed with the Court.

     A final Presentence Report (PSR) calculates Mr. Harris' total offense level as 10, his criminal history category as III, and an advisory sentencing range of 10-16 months incarceration.  Each count of conviction has a statutory maximum sentence of 12 months.  Mr. Harris has no objection to these advisory guideline calculations.

     The plea agreement between the parties contemplated an advisory guideline range of 6-12 months, based upon the belief that Mr. Harris was in criminal history category I.  In that proposed plea agreement, the government agreed to request a sentence at the low end of the advisory guidelines, reserving the right to seek a sentence in excess of 6 months if new facts warranting such a change were discovered prior to sentencing.

Mr. Harris respectfully requests that the Court impose a sentence of probation for a period of time to be determined by the Court. Recognizing the nature of the offense conduct and the issues that have arisen during the pendency of this case, Mr. Harris respectfully suggests that the Court add the following terms to his probationary period: (1) that Mr. Harris continue to participate in substance abuse treatment; (2) that Mr. Harris completes 100 hours of community service; (3) that he remain law abiding; (4) that Mr. Harris write letters of apology to the organization that he threatened over the phone, with the following exception, that he has no further contact with any of the organizations who were subject to his threatening phone calls or employees of those organizations.

Mr. Harris completely understands the seriousness of his offense. During the course of this case, he has come to realize how scary his conduct was to others, and he desperately wishes that there was some way to undo what he did. His unthinking lashing out was a product of his personal circumstances, to selfishly make himself feel better about his unemployment and his drinking. Though this was a highly inappropriate and unacceptable manner to deal with personal issues, it remains important to distinguish Mr. Harris' motivations from someone who intends more. Again, Mr. Harris does comprehend that the people and organizations who receive such threats have no ability to distinguish between those two types of people, and his remorse for causing them fear is palpable. Nonetheless, for purposes of sentencing, it is necessary to incorporate Mr.

Harris' motivations since it bears upon such sentencing factors as specific deterrence, protection of the public, the necessity for rehabilitative services, et cetera.

In this instance, a probationary sentence would properly account for all the sentencing factors subsumed in 18 U.S.C. Section 3553(a). Specifically, the prompt manner in which Mr. Harris has accepted responsibility for his crime, the circumstances of his offense conduct, and the extremely low likelihood that he will commit a similar offense in the future in light of his history and his commitment to sobriety. Such a sentence would also comport with the statutory directive to fashion a sentence that is sufficient but not greater than necessary to satisfy the various goals of sentencing.

## I.      Breadwinner to alcoholic

Mr. Harris' life wasn't going very well. On the surface, he and his family looked pretty typical with little seemingly amiss. He and his wife were engaged to be married, they were expecting their first child, and they were shopping for their first home . By appearances, they were a young family beginning their lives together as many do. However, things were about to take a turn for the worse, and Mr. Harris handled these challenges in an embarrassingly immature manner.

After returning to work after paternity leave, Mr. Harris lost his job. In his mind, this could not have happened at a worse time, just when his family had taken on additional financial commitments: the birth of their first child, they had just started paying student loans, and they were trying to purchase their first house together. The loss of his

job preyed on his mind; he felt that it was his responsibility to be a breadwinner, and he felt unmanned by losing that part of his identity. He was so affected that he fell into a funk and sought mental health counseling in 2010. He was not provided with any counseling sessions, but he was diagnosed formally with depression and prescribed medication. He also developed a sleeping disorder and is currently prescribed medication for the same. Mr. Harris also can suffer from a stutter that on occasion causes him social embarrassment.

Unfortunately during this period, Mr. Harris also began drinking heavily. Earlier in his life, he drank quite heavily, and the loss of his job and the hours spent idle at home triggered a relapse. As with his depression, he endeavored to seek treatment, first in 2010, then again in June 2014 (30 day inpatient program) and 2016 (60 day outpatient program). He is currently attending Alcoholics Anonymous as part of his aftercare.

The offense conduct occurred in May 2014, just before he enrolled in the June 2014 inpatient treatment program. At that time he was drinking at least 15 beers a day, often alone while his wife was at work. Mr. Harris knew that his drinking was out of control, and during one of his binges grabbed a telephone book to call an alcohol clinic. As he scrolled through the alphabetical listings, he came across "abortion clinics." For whatever reason, amidst his stupor, he impulsively called two of the numbers listed. The next day, drunk again, he placed a third call. He remains unsure why exactly he made these phone calls. In the context of his life circumstances, his depression, and his

4

alcoholism, it seems reasonable to infer, however, that the illusion of power and control by making threatening phone calls temporarily compensated for his general feelings of dented masculinity.

At all times, Mr. Harris has accepted responsibility for his actions and poor judgment. He immediately took steps to address his alcoholism. He has expressed extreme remorse throughout. He has never done anything lie this before, and his is unlikely to do anything like this again in the future.

## II.     Timelime of the prosecution

The day after the offense conduct, law enforcement confronted Mr. Harris at his home at approximately 9:45 am. Even then, law enforcement noted that Mr. Harris appeared intoxicated and disheveled. Mr. Harris immediately volunteered that he had made some phone call. He also told them that he needed helped for his drinking and was searching for a treatment facility when he came across the clinic numbers in the phone book.

Mr. Harris consented to a search of his home, and law enforcement confrimed that there were no weapons found in the house. Law enforcement characterized Mr. Harris as "extremely apologetic, cooperative, and remorseful about the situation." This contact with law enforcement occurred on May 14, 2014. Other investigation into Mr. Harris and his family revealed no suggestion that they were involved in anti-abortion politics or organizations.

5

On May 16, 2014, Mr. Harris was enrolled in a 30 day inpatient treatment program.

Mr. Harris received a target letter from the government approximately a year after this incident, informing him that he was the subject of a federal investigation.

## III.     Sentencing Factors Pursuant to 18 U.S.C. § 3553(a)

When imposing sentence, the Court must consider the factors delineated in 18 U.S.C. § 3553(a).  In the final analysis, the Court is required to make sure that any sentence selected is "sufficient, but not greater than necessary" to meet the purposes of punishment.  § 3553 (a)(2).

While the advisory guideline calculation remains an important consideration and stands at the starting point for sentencing judges, it is "not the only consideration" in determining the appropriate sentence. *Gall v. United States,* 552 U.S. 38, 49 (2007).  To the contrary, the guidelines "'reflect a rough approximation of sentences that *might* achieve § 3553(a)'s objectives.'"  *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)) (emphasis added).  A sentencing court "may not presume that the Guidelines range is reasonable."  *Gall,* 552 U.S. at 50 (citing *Rita*, 551 U.S. at 351).  Rather, the sentencing court must make an "individualized assessment based on the facts presented."  *Gall*, 552 U.S. at 50.  Above all, a court's final determination of a sentence must reflect "§ 3553(a)'s overarching instruction to 'impose a sentence sufficient, but not greater than necessary' to accomplish

6

the sentencing goals advanced in 3553(a)(2)," namely, retribution, deterrence, incapacitation, and rehabilitation. *See Kimbrough*, 552 U.S. at 111.

In making these individual assessments, sentencing courts are free to disagree with the guidelines' recommended sentence in any particular case, and may impose a different sentence based on a contrary view of what is appropriate under § 3553(a). This includes the freedom to disagree with "policy decisions" of Congress or the Sentencing Commission that are contained in the guidelines. *See Pepper v. United States*, 131 S. Ct. 1229, 1241 (Mar. 2, 2011) ("[O]ur post-*Booker* decisions make clear that a district court may in appropriate cases impose a non-Guidelines sentence based on a disagreement with the Commission's views.... That is particularly true where, as here, the Commission's views rest on wholly unconvincing policy rationales not reflected in the sentencing statutes Congress enacted."); *Spears v. United States*, 129 S. Ct. 840, 843 (2009) (confirming *Kimbrough's* holding that courts may vary from particular guideline because of policy disagreement with that guideline) (*per curiam*).

Mr. Harris respectfully believes that the 3553(a) factors support a sentence of probation with conditions. Such a sentence would comport with the statutory mandate that a sentence be sufficient but not greater than necessary.

## A.     The History and Characteristics of Mr. Harris

This is by far the most serious error of judgment that Mr. Harris has committed in his life. He is highly ashamed of his behavior. His conduct here, however, is also highly

7

anomalous and extremely unlikely to ever happen again.

Mr. Harris promises that the consequences of this instant case are sufficient to prevent him from making this mistake again.  Mr. Harris clearly understands how this situation came to be and how he exercised poor, short-term judgment by engaging in the offense conduct.  In his own words:

> I am very sorry that I did this.  Everyday I wish I could take it back.  I don't want to make any excuses for what I did.  It was horrible.

> I was at a low point in my life when this happened.  I wasn't working at the time because I had relapsed with alcohol, and I fell into a bad pattern of being depressed because of my drinking and drinking because I was depressed.  I honestly still don't remember making these telephone calls and only realized that I had done this when police came to my front door.  When I heard the recordings of what I had said, I was shocked and immediately ashamed.  I've never done anything like this before, and I couldn't believe what I heard myself saying.

> I am completely ashamed and embarrassed.  I can't believe I did something like this, and there is no way I would ever do something like this again.  This experience has been demoralizing and I wouldn't be able to take the guilt of what I'm doing to my family again.  I am going to spend a very long time making this up to my family.  I am just so grateful that they are sticking with me.

> Since this case began, I began in-patient treatment, which I started on my own, and I've been sober now for more than two months.  Alcohol abuse has been part of my life since I was thirteen years old.  I am absolutely committed to never drinking or using drugs ever again in my life.  They have only caused me troubles and can only ruin my life in the future.

> I wish I could take everything back.  I feel that this was totally out of character and can only say that I think the key is to remain sober.  To the court, to my family, to the clinics I called, I promise I'll stay sober and never do something like this again.

## B.    The Need for Deterrence and to Protect the Public

Mr. Harris promises the consequences of this instant case and his commitment to

sobriety are sufficient to prevent him from making this mistake again.  He has continued to be engaged in the therapeutic process, and he understands that this may be a lifelong issue for him.  Nonetheless, he clearly understands that alcohol is his Achilles' heel.

Thus, although general deterrence still applies as a reasonable consideration, specific deterrence and the need to protect the public in the future from further crimes by Mr. Harris are of minimal concern in this instance. Mr. Harris was not prone to such behavior prior to this event and is extremely unlikely to engage in anything even remotely similar in the future.

The sentencing statute requires the Court to consider the "need for the sentence imposed . . . to afford adequate deterrence to criminal conduct" and the need to "protect the public from further crimes of the defendant."  18 U.S.C. §§ 3553(a)(2)(B) & (C). While many believe that the higher the sentence, the greater the effect in deterring others, the empirical research shows no relationship between sentence length and deterrence. The general research finding is that "deterrence works," in the sense that there is less crime with a criminal justice system than there would be without one. But the most pertinent question for this Court is imprisonment is minimally necessary to serve this purpose of sentencing. And, in Mr. Harris's particular circumstances, the answer is a resounding "no."

After more than two decades of extraordinary growth in the use of incarceration as a sanction for criminal conduct, players from across the criminal justice spectrum are

beginning to question its efficacy on a number of fronts, including its efficacy as a

deterrent. In a speech at an event sponsored by the Vera Institute of Justice, former

Attorney General Eric Holder noted that the still-growing rates of incarceration are

having little effect on crime rates.

> [W]hile prison building and prison spending continue to increase, public
> safety is not improving. Since 2003, spending on incarceration has
> continued to rise, but crime rates have flattened. Indeed, crime rates appear
> to have reached a plateau, and no longer respond to increases in
> incarceration.

*See* Remarks as prepared for delivery by Attorney General Eric Holder at the Vera

Institute of Justice's Third Annual Justice Address (event held July 9, 2009).[1] *See also*

PUNISHMENT & INEQUALITY ch. 7 (Did the Prison Boom Cause the Crime Drop?)

(reviewing and evaluating research regarding effects of incarceration on crime rates and

concluding that evidence "suggests that mass imprisonment helped reduce crime and

violence in the United States in the late 1990s, but the contribution was not large").

    The government can point to nothing - no study, no empirical evidence - in

support of its position that a guideline range sentence is any more effective in terms of

specific or general deterrence than a sentence of probation. In contrast, there is evidence

demonstrating that prison may heighten the risk of recidivism. *See e.g.*, THE

SENTENCING PROJECT, INCARCERATION AND CRIME: A COMPLEX

---

[1] Available at http://www.vera.org/download?file=2864/AG-Eric-Holder-Justice-
Address-Transcript.pdf.

RELATIONSHIP 7 (2005) ("The rapid growth of incarceration has had profoundly disruptive effects that radiate into other spheres of society. The persistent removal of persons from the community to prison and their eventual return has a destabilizing effect that has been demonstrated to erode family and community bonds, and contribute to an increase in recidivism and future criminality.") (footnote and citation omitted). *See also generally* JUSTICE STRATEGIES, CHILDREN ON THE OUTSIDE: VOICING THE PAIN AND HUMAN COSTS OF PARENTAL INCARCERATION (2011) (discussing effects of parental incarceration on children's emotional and economic well-being).[2] In contrast to an argument about the *length* of the sentence, it is, rather, the *certainty* of sentence, not the severity of sentence, that imparts the deterrent effect.

Moreover, the Court has the threat of prison to hold over Mr. Harris during a probationary term if he were tempted to commit any further criminal activity; that *certain* punishment constitutes the most effective deterrent that exists because Mr. Harris is now made aware specifically that punishment, specifically, further federal prison, will follow any similar errors of judgment.

Because sufficient deterrence can be achieved with probation, Mr. Harris requests that the Court impose a sentence without undue regard to the advisory range.

This also true when analyzed through the lens of whether there is any need to

_____

[2]Available at http://www.justicestrategies.org/sites/default/files/publications/JS-COIP-1-13-11.pdf.

protect the public from further crimes. Not only does the foregoing apply in this context as well, it is also true that law enforcement was quickly satisfied that Mr. Harris posed no actual threat despite his phone calls. He was not arrested at the time, and he did not receive his target letter for approximately a year after he made those phone calls in 2014. The criminal information was filed in February 2016, more than a year and half after the offense conduct.

Since May 2014, a period now of approximately 21 months and including a period of a year when he had no idea that he might be prosecuted, Mr. Harris has done nothing remotely same or similar. Law enforcement was plainly satisfied that he posed no actual threat, and the time elapsed since then has vindicated that assessment. Accordingly, the need to protect the public from future crimes has already been assuaged by the passage of time during which Mr. Harris has demonstrated no ongoing proclivity for similar behavior.

**C.    The punitive purpose of sentence can be achieved with a probationary sentence.**

For Mr. Harris, the punitive purpose of sentencing can be achieved with a sentence of probation. That is because the punitive effect of any sentence is not viewed in a vacuum by simple, bland reference to an offense; rather, that effect is, and must be, measured against Mr. Harris and his individual case. For him, even a below-guideline sentence represents significant punishment because he has never been to prison before. Indeed, Mr. Harris only prior experience with custody was a two-day sentence in a local

jail.

Finally, were this Court to have any concerns that a probationary sentence would not adequately punish Mr. Harris, the ensuing years of supervision should assuage those concerns. During that time, he will be strictly monitored by United States Probation.  Any failure to comply with the conditions that this Court sets will result in a violation and the threat of further prison; the repercussions from the Court will be swift and severe.  Thus, a sentence below the advisory range adequately achieves the goal of punishing Mr. Harris.

**D.   The rehabilitative purpose of sentencing warrants a sentence below the advisory range.**

Section 3553(a)(2)(D) requires the Court to consider "the need for the sentence imposed . . . to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." This purpose militates strongly in favor of a sentence below the advisory range. As a preliminary matter, Congress has explicitly directed that "imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).  In other words, locking someone up neither achieves nor is a substitute for rehabilitation or achieving the goals set forth in § 3553(a)(2)(D). Thus, imprisoning Mr. Harris for any term cannot be justified on the basis of offering him any psychological or medical rehabilitation.

During the pendency fo this case, Mr. Harris has engaged in alochol treatment and

13

continues to attend Alcoholics Anonymous.  He has also been working again since October 2016.  He and his wife now have three children and are homeowners.  To imprison Mr. Harris now would undo all the progress he has made and unfairly set his family back.

Thus, a sentence below the range is appropriate for Mr. Harris because it achieves the goals of sentencing. Since prison may not be used to further rehabilitation, that purpose does not militate in favor of a sentence in the mechanically calculated range; in fact, the criminogenic effects of incarceration militate *against* incarceration.

**E.    A below-range sentence does not run afoul of the goal of avoiding unwarranted disparity because it is a *warranted* disparity.**

The Court must also consider the need to avoid unwarranted disparities among similar offenders. 18 U.S.C. § 3553(a)(6). However, this preference is not to avoid all disparities at all costs. Rather, it is to avoid *unwarranted* disparities; disparity remains an ameliorative tool to adjust the guidelines because "[f]air sentencing is individualized sentencing." *Fifteen Years of Guidelines Sentencing*, at 113 (Nov. 2004). As this memorandum has demonstrated, the proposed guideline range of imprisonment in this instance is at odds with the 3553(a) factors – specifically, the factors of the history and nature of Mr. Harris, the need for specific deterrence, to provide just punishment, and the need to protect the public – and thus warranting a variance and thus avoiding an unwarranted sentencing disparity.

Again, any concerns the Court might have regarding Mr. Harris' future propensity

14

can be readily assessed during a probationary period.  Mr. Harris understands that

punishment, specifically a term of incarceration in federal prison, almost certainly awaits

him if any further similar errors of judgement occur during this period and beyond.

Moreover, the expense of incarcerating a federal inmate to the American public is

staggering.[3] As the Court is aware, innumerable conversations are underway currently

regarding the intersection of budget constraints and an effective, efficient administration

of justice. When the factors of deterrence and recidivism are minimal, a lesser sentence is

warranted.

## III.    Conclusion

For all the foregoing, Mr. Harris respectfully requests that the Court impose a

sentence of probation along with conditions designed to address his alcoholism.  Such a

sentence would be sufficient but not greater than necessary to comply with the various

purposes of sentencing.

Put most succinctly, Mr. Harris made a poor but highly anomalous decision at a

particularly low point in his life.  The mere fact of a felony conviction already imposes a

significant collateral punishment regarding his future ambitions.  All indications strongly

suggest that he will never be before this or any other court in the future for similar

transgressions.

---

[3]As reported by the PSR, the annual cost of incarceration to the Bureau of Prisons
is $31,976 per inmate.  (PSR ¶ 90.)

Dated:   January 29, 2017                         Respectfully submitted,


*s/ James S. Becker*

_____

JAMES S. BECKER

Attorney ID No. 388222

Attorney for Defendant

107 U.S. Courthouse

300 South Fourth Street

Minneapolis, MN 55415

16